IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MOKULEIA PRESERVATION PARTNERS, L.L.C.; MALANI, INC.; MOKULEIA POLO FARMS, L.L.C., <br><br>   Plaintiffs,<br><br>vs.<br><br>WESTERN UNITED LIFE ASSURANCE COMPANY,<br><br>   Defendant. | CIVIL NO. 04-00283 DAE BMK<br><br>DECLARATION OF A. BERNARD BAYS; EXHIBITS "1"-"14", "21" |

### DECLARATION OF A. BERNARD BAYS

I, A. BERNARD BAYS, declare as follows:

1. Unless otherwise indicated, I make this declaration based upon my personal knowledge and belief.

2. I am the President, Treasurer and Director of Plaintiff Malani, Inc. ("Malani").

3. I am also the Trustee of my pension plan, A. Bernard Bays, A Law Corporation, Money Purchase Pension Plan which is the sole member of ABBALC, LLC which in turn is a member of Plaintiff Mokuleia Preservation Partners, L.L.C. ("MPP")

4. Michael K. Dailey is the sole member of Mokuleia Polo Farms, L.L.C. ("MPF") which in turn is also a member of MPP.


EXHIBIT A

5.     Michael K. Dailey and I recognized the value and development potential of the property commonly known as the Dillingham Ranch (more particularly described as TMK Nos.: Oahu 6-8-2-6-9, 10, 11, 14 & 16, 6-8-3-5, 6, 11, 15, 16, 17, 19, 20, 21, 30, 31, 33, 34, 35, 38, 39 & 40 and 6-8-8-22) ("Dillingham Ranch").

6.     Sometime prior to 1996, Mr. Dailey and I commenced efforts to acquire the Dillingham Ranch.

7.     After working for years with two other financial partners, Dailey and I eventually secured an executory contract to purchase the ranch and formed Malani, MPP and MPF for the transaction in 2002.

8.     Malani as agent for MPP and MPF entered into the executory contract to purchase the Dillingham Ranch.

9.     Representatives of Metropolitan approached Mr. Dailey and I regarding the opportunity to purchase and develop the Dillingham Ranch.

10.    Eventually, Metropolitan through its affiliate Summit Property Development agreed to purchase the oceanfront parcels of the Dillingham Ranch and to affiliate with MPP, Malani and MPF in the purchase, development and sale of the Mauka Land (more particularly described as Tax Map Key Nos.: Oahu 6-8-2-6, 9, 11 and 16, 6-8-3-5, 6, 11, 15, 16, 19, 20, 21, 30, 31, 33, 34, 35, 38, and 40 (collectively "Mauka Land"). See Exhibit "1".

11. In exchange, <u>MPP, Malani and MPF agreed to and did forego their interests and participation in the several valuable oceanfront parcels.</u>

12. At the time of this agreement, the parties discussed how to document their respective interests in the Mauka Land would be documented while they developed and sold the property.

13. In that regard, Representatives of Summit expressly represented to Bays and Dailey that the interests of MPP, Malani and MPF in the Mauka Land could not be reflected on title because of regulatory requirements governing Metropolitan and its subsidiary WULA.

14. The Summit representatives stated that the interests of MPP, Malani and MPF in the Mauka Land would instead be protected by a development agreement with MPP and consultant agreements with Malani and MPF, respectively.

15. In consideration for, among other things, the documentation of MPP, Malani and MPF's interests in the Mauka Land through the executed development agreement and consultant agreements, Malani transferred title at closing of the Mauka Land to Metropolitan, subject to the Development Agreement and Consultant Agreements.

16. Malani also transferred the oceanfront properties of the Dillingham Ranch to subsidiaries of Metropolitan free and clear. The total consideration paid by Metropolitan to Plaintiffs at closing for all the Dillingham Ranch Property (including both the Mauka

3

Land and the oceanfront property) was less than $20 million including closing costs, payment of commissions and all other costs of the transaction.

17. Attached hereto as Exhibit "1" is a true and correct copy of June 27, 2002 letter from Malani to Summit Property Development. I signed this document as President of Malani. This document is kept by me in the ordinary course of my business as a principal of Malani.

18. Attached hereto as Exhibit "2" is a true and correct copy of the Dillingham Ranch Development Agreement ("Development Agreement"). I signed this document for MPP as Trustee of the A. Bernard Bays, A Law Corporation, Money Purchase Pension Plan. This document is kept by me in the ordinary course of my business as Trustee.

19. Attached hereto as Exhibit "3" is a true and correct copy of the Joinder To Dillingham Ranch Development Agreement ("Joinder to Development Agreement"). I also signed this document for MPP. This document is kept by me in the ordinary course of my business as Trustee.

20. MPP and Metropolitan and later WULA reached agreements on the "Summit Project Concept" ("Project Concept") and general development plan for the Mauka Land and developed budgets and marketing strategies for the implementation of the development plan in the fall of 2003.

4

21. Dailey and I kept our end of the bargain and MPP's principals worked with Summit representatives to devise the Project Concept and associated development plans, budgets and marketing strategies.

22. MPP, WULA and Metropolitan then entered into the Amendment to Dillingham Ranch Development Agreement, executed in 2003 but effective as of July 31, 2002 ("Development Agreement Amendment").

23. Attached hereto as Exhibit "4" is a true and correct copy of the Development Agreement Amendment. I signed this document for MPP as Trustee of the A. Bernard Bays, A Law Corporation, Money Purchase Pension Plan. This document is kept by me in the ordinary course of my business as Trustee.

24. Under the Development Agreement Amendment, the parties agreed, among other things, that any sale of the Mauka Land for a sum less than $25,000,000.00 would require MPP's prior written consent. The purpose of this provision was to prevent WULA from selling the Mauka Land in bulk for a price below $25,000,000.00, which would deprive MPP from receiving minimum compensation for its interest in the Mauka Land.

25. Attached hereto as Exhibit "5" is a true and correct copy of the July 31, 2002 Consultant Agreement between Malani and Metropolitan ("Malani Agreement"). I signed this document as President of Malani. This document is kept by me in the ordinary course of my business as a principal of Malani.

26.  Attached hereto as Exhibit "6" is a true and correct copy of the December 20, 2002 Joinder to the Malani Agreement ("Joinder To Malani Agreement"). I signed this document as President of Malani. This document is kept by me in the ordinary course of my business as a principal of Malani.

27.  Attached hereto as Exhibit "7" is a true and correct copy of the July 31, 2002 Consultant Agreement between MPF and Metropolitan ("MPF Agreement"). This document is kept by me in the ordinary course of my business as a principal of Malani.

28.  On December 20, 2002, WULA, Metropolitan and MPF thereafter executed the Joinder to the MPF Agreement under which WULA assumed all of Metropolitan's duties and obligations under the MPF Agreement. The terms of the joinder track the terms in the Joinder To Malani Agreement which is attached as Exhibit "6".

29.  The amounts required to be paid to Malani and MPF under their respective consultant agreements <u>were part of the consideration for transfer of the Mauka Land to WULA</u>. Therefore, <u>the consultant agreements did not allow for termination prior to payment of the entire amounts due under those agreements, unless the planned development was completed and the last lot was sold</u>.

30.  On August 1, 2002, Dillingham Ranch Management, LLC (an LLC that Malani and MPF are the only members of), Metropolitan and other entities entered into the Property Management Agreement ("Management Agreement").

6

31. Attached hereto as Exhibit "8" is a true and correct copy of the August 1, 2002 Management Agreement. I signed this document as President of Malani. This document is kept by me in the ordinary course of my business as a principal of Malani.

32. Attached hereto as Exhibit "9" is a true and correct copy of the December 20, 2002 Addendum to the Management Agreement. I signed this document as President of Malani. This document is kept by me in the ordinary course of my business as a principal of Malani.

33. Plaintiffs, through the efforts of myself and Mr. Dailey, have provided the necessary management and consulting services under the management and consulting agreements described above.

34. All WULA had to do was provide the funding it had agreed to provide, work with Plaintiffs on the development of the property pursuant to the mutually agreed upon development plan and pay Plaintiffs the sums owed to them under the various agreements.

35. On February 4, 2004, Metropolitan filed for Bankruptcy in Washington State and WULA consented to being placed, and was placed, under rehabilitation proceedings under the laws of the State of Washington in January of 2004.

36. Wayne C. Metcalf, the Special Deputy Insurance Commissioner for the State of Washington and Chief Deputy Receiver for WULA, informed me during a meeting in

Spokane, Washington, that WULA did so despite being in good financial health with over $100,000,000.00 in net worth.

37. Between about February 16, and February 24, 2004, Mr. Dailey and I held several meetings with representatives of WULA and Mr. Metcalf regarding WULA's obligations relating to the Mauka Land and the Project.

38. In those meetings, the President and Executive Vice President of WULA expressly represented to Mr. Dailey and I that WULA would honor its commitments and obligations under the Development Agreement, Management Agreement, Malani Agreement and MPF Agreement.

39. Likewise, Mr. Metcalf similarly expressly represented to me that WULA was financially sound and would honor its agreements with MPP, Malani and MPF.

40. In addition, during the time Mr. Dailey and I were in Spokane in February of 2004, WULA was considering two offers which had been made to purchase the Mauka Land.

41. Representatives of WULA told Mr. Dailey and I that it was necessary to reach an agreement on the amounts owed to Plaintiffs in the event of a sale so that WULA would know what it had to pay to Plaintiffs out of the sales proceeds.

42. WULA's representatives also told Mr. Dailey and I that their accounting department was busy calculating the amounts due to Plaintiffs and that they wanted to

meet with us to resolve the amounts due to Plaintiffs before Mr. Dailey and I left Spokane.

43. However, WULA's accounting department was not able to complete its calculations until Plaintiffs' representatives and WULA's representatives met on February 23, 2004 to agree upon what portion of sale proceeds would be paid to Plaintiffs in the event the Mauka Land was sold.

44. During that meeting, WULA and MPP agreed that MPP would receive the sum of $6,150,948.00 in the event of a sale of the Mauka Land for a price of $25,000,000.00.

45. That sum was <u>calculated by WULA's accounting representatives</u> as the amount due to MPP <u>under the distribution formula set forth in the Development Agreement</u> in the event of a sale at a price of $25,000,000.00.

46. MPP also agreed that it would consent to a sale of the Mauka Land for a price less than $25,000,000.00 provided it received $6,150,948.00 from the sale proceeds.

47. At WULA's request, the agreement made at the February 23, 2002 meeting ("February 23 Agreement") was confirmed by letter of that same date to WULA.

48. Attached hereto as Exhibit "10" is a true and correct copy of the February 23 Agreement. I signed this document. This document is kept by me in the ordinary course of my business as a principal of Malani.

9

49. Attached hereto as Exhibit "11" is a true and correct copy of the March 30, 2004 letter to me from Patricia L. Johnson, Associate Corporation Counsel for WULA. The calculations proposed by WULA's accounting department are attached to the letter. This document is kept by me in the ordinary course of my business as a principal of Malani.

50. WULA has materially breached the Development Agreement by <u>inter alia</u> failing and refusing to fund the budget, or fund or authorize expenditures necessary for the development of the Mauka Land in accordance with the approved Project Concept and failing to take appropriate action to preserve the value and potential of the Mauka Land.

51. WULA and its Receiver have refused to move forward with the approved development, and have allowed the condition of the Mauka Land to deteriorate and caused its development value to decline.

52. WULA failed to deposit the required $100,000.00 into the Dillingham Ranch operating account and failed to provide the funds for operations pursuant to the Management Agreement. Consequently, Plaintiffs were forced to loan $75,000.00 to fund the operations of Dillingham Ranch before WULA terminated Plaintiffs without notice.

53. WULA and its Receiver terminated Plaintiffs, locked them out of the Mauka Land without giving them the thirty (30) days notice required by the Management

Agreement and replaced them with property managers from the mainland who have no knowledge of the Mauka Land.

54. Prior to terminating Plaintiffs, WULA had also terminated all of its own management personnel who were familiar with the Mauka Land and the project. WULA's manager who terminated Plaintiffs, Gregory Leigey, had never spoken to Dailey or me about the property or the project prior to the termination.

55. WULA's personnel even took Mike Dailey's personal computer without his knowledge or consent and had it forensically examined by a computer expert. Upon terminating Plaintiffs, Mr. Leigey had uniformed guards posted at the gates to the Mauka Land in the morning without notice to me or Dailey and locked out Dailey and the other ranch employees. These actions created the impression in the community that the property was distressed. This information spread like wildfire to potential buyers that Dailey and Bays were working with to position the property as an exclusive and valuable investment. These actions devalued the property substantially for no good reason.

56. Attached hereto as Exhibit "12" is a true and correct copy of the Complaint filed July 13, 2004 by Gib Black Advertising Group, Inc. ("Gib Black Complaint"). I received this document in my capacity as a principal of Malani. This document is kept by me in the ordinary course of my business as a principal of Malani.

57. Despite the fact that Plaintiffs could help WULA obtain maximum value for the Mauka Land, WULA and its Receiver have ignored Plaintiffs' efforts to provide such

assistance and have been evasive as to their plans for the property, including their efforts, if any, to sell.

58. Attached hereto as Exhibit "13" is a true and correct copy of the Order Of Rehabilitation And Appointment Of Receiver, filed March 3, 2004 ("Initial Order"). I received this document in my capacity as a principal of Malani. This document is kept by me in the ordinary course of my business as a principal of Malani.

59. Attached hereto as Exhibit "14" is a true and correct copy of the Amended Order Of Rehabilitation And Appointment Of Receiver, Ex Parte filed October 22, 2004 ("Amended Order"). I received this document in my capacity as a principal of Malani. This document is kept by me in the ordinary course of my business as a principal of Malani.

60. On May 3, 2004, Plaintiffs filed the Complaint in the present case to have WULA and its Receiver recognize Plaintiffs' interests in the Mauka Land.

61. Plaintiffs simultaneously filed their Demand for Mediation/Arbitration with DPR pursuant to the arbitration clauses in the various agreements.

62. Plaintiffs brought legal action because WULA indicated that it would breach the Development Agreement and refuse to pay Plaintiffs for Plaintiffs' interest in the Mauka Lands.

63. Metropolitan paid approximately $20 million to close the purchase of Dillingham Ranch (including both the Mauka Land and the oceanfront properties) from

Plaintiffs including commissions, closing costs, due diligence costs, initial payments to the Plaintiffs and other payments.

64.  The properties transferred to Metropolitan by Plaintiffs (the Mauka Lands and oceanfront parcels) have an estimated aggregate value, without further development work, of well over $60 million if sold now.

65.  The estimated values for the properties are as follows:

| Oceanfront Properties | Listing Prices | Estimated Value |
|---|---|---|
| TMK 6-8-2-10 | $1,600,000 | $1,000,000 |
| 6-8-2-14 | 2,000,000 | 1,000,000 |
| 6-8-8-22 | 1,300,000 | 500,000 |
| 6-8-3-39 Lot 1 | 7,038,000 | 6,000,000 |
| Lot 2 | 7,904,000 | 6,000,000 |
| Lot 3 | 8,391,000 | 7,000,000 |
| Lot 4 | 8,409,000 | 7,000,000 |
| 6-8-3-17 | 18,826,000 | 14,000,000 |
| **Total for Oceanfront** | $55,468,000 | $42,500,000 |
| **Mauka Land** | $25,000,000 | $23,000,000 |
| **Total Value of Land** | $80,468,000 | $65,500,000 |

66. If the Mauka Land is developed pursuant to the mutually approved development concept, then the aggregate value of these properties would escalate to about $100 million.

67. Thus, WULA and its affiliate Metropolitan have received a tremendous financial benefit from this real estate investment. Plaintiffs simply want to assure that WULA pays them the consideration they bargained for when they transferred the properties to Metropolitan.

68. Plaintiffs in this action are citizens of the State of Hawaii.

69. WULA is a citizen of the State of Washington.

70. Plaintiffs agreements with WULA relate to the development and marketing of real property in Hawaii and contemplate the marketing and sale of that real property to individuals through interstate commerce.

71. Plaintiffs have recently secured an offer from a potential buyer but WULA has not responded to the Buyer's offer or Plaintiffs' requests to be given the terms of the offer.

72. Even though the real estate market for property like the Mauka Land is very good, WULA still has not listed the property for sale. WULA has not acted on Plaintiffs' recommendations of actions that should be taken to preserve the value of the Mauka Land, etc. For example, WULA failed to apply for subdivision approval according to its own schedule and failed to pay bills owed to its lobbyist. Consequently, a bill was passed

that restricted the number of lots that can be served by a sewage treatment plant without an Environmental Impact Statement down to 49 lots. This legislation effectively reduced the number of lots in the proposed subdivision from 82 or 83 lots down to 67 lots or less. Id. This significantly reduced the value of the Mauka Land.

73. Attached hereto as Exhibit "22" is a true and correct copy of the April 19, 2004 letter. This document was received by me and is kept by me in the ordinary course of my business as a principal of Malani.

I declare under penalty of perjury under the laws of the State of Hawaii that the above is true and correct.

Executed this 1st day of December 2004, at Honolulu, Hawaii.

_____
A. BERNARD BAYS