## DILLNGHAM RANCH DEVELOPMENT AGREEMENT

THIS DILLINGHAM RANCH DEVELOPMENT AGREEMENT (this "Agreement") is made effective as of this ___31st___ day of July, 2002 (the "Effective Date"), by and between **METROPOLITAN MORTGAGE AND SECURITIES CO., INC.**, a Washington corporation ("Metropolitan"), and **MOKULEIA PRESERVATION PARTNERS, L.L.C.**, a Hawaii limited liability company ("MPP").

### R E C I T A L S:

A.      MPP had a contract, though Malani, Inc., a Hawaii corporation and MPP's affiliate ("Malani"), to purchase the Dillingham Ranch property, located at Mokuleia, Oahu, Hawaii (identified as Tax Map Key Nos.: Oahu 6-8-2-6, 9, 10, 11, 14 & 16, 6-8-3-5, 6, 11, 15, 16, 17, 19, 20, 21, 30, 31, 33, 34, 35, 38, 39 & 40 and 6-8-8-22) (the "DR Property").

B.      Summit Property Development, a Washington corporation ("Summit"), and Malani executed that certain Letter Agreement dated June 27, 2002 (the "Letter Agreement"), pursuant to which Malani agreed to sell to Summit or its designee, and Summit or its designee agreed to purchase from Malani, the DR Property. The DR Property consists of the Beachfront Parcels and the Mauka Land. Unless otherwise specified herein, capitalized terms shall have the same meanings assigned to them in the Letter Agreement.

C.      Under the Letter Agreement, Summit or its designee agreed to enter into a development agreement with MPP, regarding the development of only the Mauka Land in accordance with the Summit Project Concept and Business Plan (the "Project").

D.      Summit has designated Metropolitan as the entity to acquire title to the Mauka Land from Malani. Summit has assigned all of its right, title and interest in and to, and obligations under, the Letter Agreement in respect of the Mauka Land to Metropolitan, and Metropolitan has accepted and assumed such right, title and interest and obligations.

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, Metropolitan and MPP hereby agree as follows:

### A G R E E M E N T:

1.      Development of the Mauka Land.  With regard to the Mauka Land, Metropolitan agrees to the general Project Concept set forth in the Business Plan and Project Maps, including the 65-lot limit, copies of which Malani has previously provided to Metropolitan.  It is understood, however, that upon Metropolitan's the acquisition of the Mauka Land, the Project team will promptly meet to review such materials and develop the Summit Project Concept and Business Plan, to be based on such materials, and other materials, with the understanding that the Summit Project Concept and Business Plan may possibly differ from the Business Plan and the Project Maps (except for the 65-lot limit) at

**EXHIBIT** "2"

EXHIBIT **D**

the sole discretion of Metropolitan in some or even all respects, including, without limitation, the design, development, operation, management, marketing and sales of any or all 65 lots, as the Project and market conditions evolve.

2.    Term. The term of this Agreement shall commence as of the Effective Date and, unless sooner terminated in accordance with the terms of this Agreement, shall terminate on the earlier to occur of: (a) Project sellout and final distribution of funds; or (b) the date which is twenty (20) years after the Effective Date.

3.    Distributions. All distributions from the Project shall be made in the following order:

a.    Category 1. Metropolitan shall be entitled to receive all distributions from the Project up until the following have been satisfied:

(1)    Metropolitan's payments required under the Letter Agreement, including: (i) US$250,000.00 to Steve Goodfellow or his designee ("Goodfellow"), US$125,000.00 to Malani, and US$625,000.00 to Mokuleia Polo Farms, L.L.C., a Hawaii limited liability company ("Mokuleia Polo"), for their expenses; (ii) US$125,000.00 to Goodfellow for its escrow deposit and one-half (1/2) of expenses for due diligence material; (iii) US$550,000.00 to ABB ALC LLC, a Hawaii limited liability company; (iv) US$37,500.00 and US$37,500.00 (total US$75,000.00) to Malani and Mokuleia Polo, respectively, for one-half (1/2) of expenses for due diligence material; and (v) US$150,000.00 to David Monahan for his expenses;

(2)    Any additional equity capital contributions made to the Project by Metropolitan pursuant to the Letter Agreement and Property Management Agreement; plus

(3)    A preferred return on equity capital contributions at the rate of twelve percent (12%) per annum.

b.    Category 2. After the Category 1 distributions, all distributions from the Project shall be split eighty percent (80%) to Metropolitan and twenty percent (20%) to MPP, until such time as Metropolitan has received the amount of US$11,000,000.00, plus interest at the rate of twelve percent (12%) per annum.

c.    Category 3. After the Category 2 distributions, all distributions from the Project shall be split twenty percent (20%) to Metropolitan and eighty percent (80%) to MPP, until such time as MPP has received the amount of US$4,000,000.00, without interest, less MPP's twenty percent (20%) allocation pursuant to Section 3.b above.

d.    Category 4. After the Category 3 distributions, all other distributions from the Project shall be split equally, fifty percent (50%) to Metropolitan and fifty percent (50%) to MPP.

In the event any distribution of cash or property made from the Project to a

party to this Agreement or for its benefit is not made in accordance with this Section 3, then such distribution shall count against the recipient's distributional share. By way of example only, if Metropolitan should receive a fifteen percent (15%) preferred return on its equity capital contributions, then the extra non-conforming three percent (3%) shall count against Metropolitan's next distributional share or shall be returned by Metropolitan.

4.    Project Management; Non-Opposition Covenant.

a.    The Project shall be managed and controlled exclusively by Metropolitan. All decisions regarding the Project shall be made solely by Metropolitan. Upon closing of Metropolitan's acquisition of the Mauka Land, Metropolitan shall establish a Project Management Team initially comprised of William Arsenault and Michael Teramoto

b.    As consideration for Metropolitan's execution of this Agreement, and consistent with Section A.5 of the Letter Agreement, MPP (including its principals, officers, employees, agents, members and permitted assigns) agrees that to the extent reasonably possible it shall cooperate with, support and not oppose or encourage others to oppose Metropolitan in either (i) its subdivision application to any governmental or regulatory agency as it relates to the Beachfront Parcels, or (ii) the sale of the Beachfront Parcels. The undersigned individual(s) agree this covenant shall be binding on them personally and in their corporate capacity as signatories to this Agreement.

5.    Authority. Except as otherwise provided in this Agreement, MPP shall have no authority to commit or otherwise bind Metropolitan in any way. Nothing in this Agreement shall be construed to make the parties hereto partners, joint venturers, representatives or agents of each other, nor shall either party so hold itself out. MPP shall be and is an independent contractor of Metropolitan.

6.    Default; Termination.

a.    If any party substantially breaches or substantially fails to perform any of its obligations under this Agreement (the "Defaulting Party"), the other party (the "Non-Defaulting Party") shall have the right to give the Defaulting Party a notice of default (the "Notice of Default"). The Notice of Default shall set forth the nature of the obligations which the Defaulting Party has not performed.

b.    If, within the thirty (30) day period following the Notice of Default, the Defaulting Party in good faith commences to perform such obligation and cure such default and thereafter prosecutes to completion with diligence and continuity the curing thereof and cures such default within a reasonable time, it shall be deemed that the Notice of Default was not given and the Defaulting Party shall lose no rights hereunder. If, within such thirty (30) day period, the Defaulting Party does not commence in good faith the curing of such default or does not thereafter prosecute to completion with diligence and continuity the curing thereof, the Non-Defaulting Party shall have the right to terminate this Agreement upon thirty (30) days' written notice to the Defaulting Party.

7.    Remedies. In addition to the other remedies provided for in this

Agreement, each party, in the event of a default by the other party in the performance of its obligations hereunder, shall have available to it all of the remedies at law and in equity that would otherwise be available to it as a result of such breach including, without limitation, the right to recover damages, including reasonable attorneys' fees.

       8.    <u>Confidentiality</u>. The parties agree that they will keep the terms of, and all negotiations and matters relating to, this Agreement strictly confidential. Until and unless the prior written consent of the other party is obtained, which consent may be withheld for no or any reason whatsoever, each party shall not disclose or reveal, directly or indirectly, any such information to any third party, under any circumstances, by any means or for any purpose. Each party shall cause such party's employees, officers, directors, attorneys, consultants, servants, agents and other representatives to fully comply at all times with the confidentiality obligations herein contained.

       9.    <u>Assignment</u>. Neither Metropolitan nor MPP shall have the power to assign, pledge or otherwise transfer its interest in this Agreement or any portion thereof without the prior written consent of the other party, which consent may be withheld for no or any reason whatsoever. Any assignment, pledge or transfer of the parties' rights in this Agreement without the consent required herein shall be void and of no effect.

      10.    <u>Non-Waiver</u>. It is expressly understood and agreed that the failure of Metropolitan or MPP to insist in any one or more instances upon strict performance of any of the terms and conditions of this Agreement, or to exercise any rights of Metropolitan or MPP hereunder, shall not be deemed a waiver or relinquishment of any of Metropolitan's or MPP's rights to assert or rely upon any such terms, conditions or rights in any other instance.

      11.    <u>Dispute Resolution</u>: Except as otherwise provided in this Agreement or waived in writing by all parties, any disputes arising out of or related to this Agreement, either during the term of the Agreement or afterwards, between the parties hereto, their assignees, their affiliates, their attorneys, or agents, shall be resolved in Honolulu, Hawaii as set forth hereinbelow.

      a.    <u>Good Faith Negotiations; Mediation</u>. The parties shall first seek to negotiate, in good faith and in a timely fashion, a resolution of their dispute. If such negotiations fail to resolve the dispute, then the parties shall submit the dispute to mediation by Dispute Prevention & Resolution, Inc., a Hawaii corporation ("DPR"). If DPR is unavailable, such mediation shall be handled by the American Arbitration Association ("AAA") under the AAA's Commercial Mediation Rules then in effect.

      b.    <u>Arbitration</u>. If any mediation has failed to resolve the dispute, then the dispute shall be resolved by arbitration by DPR under DPR's arbitration rules. If DPR is unavailable, such arbitration shall be handled by AAA in accordance with AAA's Rules for Commercial Arbitration then in force, except as otherwise provided herein. The arbitration shall be conducted in Honolulu, Hawaii, before a single arbitrator, who shall possess the necessary expertise about the subject matter of the dispute to be able to resolve the dispute. The decision of the arbitrator shall be final and binding, and the

arbitration award may be confirmed by a court of competent jurisdiction. The arbitrator shall not have any power to alter, amend, modify, or change any of the terms of this Agreement or to grant any remedy either prohibited by the terms of this Agreement or not available in a court of law. The arbitrator may award reasonable attorneys' fees and costs to the prevailing or most prevailing party. The provisions of applicable Hawaii arbitration law shall govern the arbitration, including the confirmation of any arbitration award.

        c.     <u>Payment</u>. Each party to the arbitration will pay its pro rata share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator. Arbitration may proceed in the absence of any party, if notice (under the DPR's or AAA's rules and regulations, as applicable) of the proceedings has been given to such party.

        d.     <u>Binding Effect and Enforcement</u>. The parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive, and they may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection. All such controversies, claims or disputes shall be settled in the above manner, in lieu of any action at law or equity.

        e.     <u>Statute of Limitations</u>. The foregoing provisions of this Section 11 notwithstanding, a party shall file a demand for arbitration with DPR or, if DPR is unavailable, AAA within ninety (90) days after it has notice (i.e., it knew or should have known) of the event, act, or omission that is the basis for that demand. If a party fails to file that notice of demand within that ninety (90) day period, then the party shall have waived and forfeited any and all rights to challenge that event, act, or omission.

        f.     <u>Waiver of Jury Trial</u>. Each of the parties to this Agreement irrevocably waives to the fullest extent permitted by law, all rights to trial by jury and all rights to immunity by sovereignty or otherwise in any action, proceeding, or counterclaim arising out of or relating to this Agreement, including, without limitation, if for any reason this Section 11 becomes inapplicable.

        12.     <u>Attorneys' Fees</u>. If a dispute arises relation to the performance of this Agreement by either party and legal or other costs are incurred, it is agreed that the prevailing party shall be entitled to recover all reasonable costs incurred in connection with the dispute, including court costs, attorneys' fees and other claim-related expenses.

        13.     <u>Notices</u>. All notices in respect of this Agreement shall be deemed received by the parties when delivered in person or by facsimile notice upon confirmation of successful transmission or five (5) days after such notices are deposited in the United States mail, certified, return receipt requested, properly addressed and with adequate postage affixed to the following addresses:



If to Metropolitan:

Metropolitan Mortgage and Securities Co., Inc.
601 W. 1st Avenue, Department 160000
Spokane, Washington 99201-5060
Attention: Bill Arsenault
(509) 835-2766 (facsimile)

and to:

Metropolitan Mortgage and Securities Co., Inc.
601 W. 1st Avenue, Department 160000
Spokane, Washington 99201-5060
Attention: Michael A. Agostinnelli, General Counsel
(509) 835-2758 (facsimile)

If to MPP:

Mokuleia Preservation Partners, L.L.C.
1696 Ala Moana Boulevard
Honolulu, Hawaii 96815
Attention: Michael Dailey
(808) 949-4906 (facsimile)

     14.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Hawaii.

     15.    <u>Persons Bound</u>. This Agreement shall be binding upon and shall inure to the benefit of the undersigned parties and their respective successors and permitted assigns.

     16.    <u>Severability</u>. If any provisions of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby.

     17.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties and supercedes any prior oral or written agreements.

     18.    <u>Amendment</u>. Any change to this Agreement shall not be effective unless evidenced by a writing signed by the parties hereto.

     19.    <u>Titles and Headings</u>. Titles and headings to articles, sections and subsections herein are for the purpose of convenience and reference only, and shall in no way limit, define or otherwise affect the provisions hereof.

20.  <u>Neither Party Deemed Drafter</u>.  The parties agree that neither shall be deemed to be the drafter of this Agreement and that, in the event that this Agreement is ever construed by a court of law, such court shall not construe this Agreement or any provision hereof against either party as the drafter hereof.

21.  <u>Facsimile Signatures; Counterparts</u>.  This Agreement and all or any related documents may be executed in two or more counterparts, and by a mechanical device or machine or by the use of facsimile signature, and each counterpart, when executed, shall be deemed an original.  All such counterparts, together, shall constitute one agreement or one document binding on all the parties thereto, notwithstanding that all the parties are not signatory to the original or the same counterpart.

[**signature page follows**]

IN WITNESS WHEREOF, Metropolitan and MPP have executed this Agreement, effective as of the date and year first set forth above.

METROPOLITAN MORTGAGE AND
SECURITIES CO., INC.,
a Washington corporation

By: _____
Name:
Title: SECRETARY

MOKULEIA PRESERVATION
PARTNERS, L.L.C.,
a Hawaii limited liability company

By ABB ALC LLC,
    a Hawaii limited liability company
    Its Member

    By A. Bernard Bays, A Law
    Corporation, Money Purchase Pension
    Plan
    Its Member

    By: _____
      Name:  A. Bernard Bays
      Title:    Trustee

By Mokuleia Polo Farms, L.L.C.,
    a Hawaii limited liability company
    Its Member

    By: _____
      Name:  Michael K. Dailey
      Title:    Member

## PROPERTY MANAGEMENT AGREEMENT

THIS PROPERTY MANAGEMENT AGREEMENT (this "Agreement" or this "interim agreement") is made and entered into on this _1st_ day of _August_, 2002, by and among **METROPOLITAN MORTGAGE & SECURITIES CO., INC.**, a Washington corporation, whose address is 601 W. First Avenue, Spokane, Washington 99201, **MOKULEIA SHORES, LLC**, a Hawaii limited liability company, **KAENA NORTH, LLC**, a Hawaii limited liability company, **MOKULEIA ESTATES, LLC**, a Hawaii limited liability company, **OCEAN SHORES PROPERTIES, LLC**, a Hawaii limited liability company, **COASTAL VIEW PROPERTIES, LLC**, a Hawaii limited liability company, and **MOKULEIA WATER, LLC**, a Hawaii limited liability company, whose collective address is 820 Mililani Street, #711, Honolulu, Hawaii (collectively "Owner"), and **DILLINGHAM RANCH MANAGEMENT LLC**, a Hawaii limited liability company, whose address is 1099 Alakea Street, 16th Floor, Honolulu, Hawaii  96813 ("Property Manager").

### R E C I T A L S   O F   F A C T:

1.    On or about July 31, 2002, Owner acquired ownership of certain real property and personal property located at the former Dillingham Ranch, Mokuleia, Oahu, Hawaii, more particularly described as Tax Map Key Nos.: Oahu 6-8-2-6, 9, 10, 14 and 16, 6-8-3-5, 6, 15, 16, 17, 19, 20, 21, 30, 31, 33, 34, 35, 38, 39 and 40 and 6-8-8-22 (collectively "DR Property").

2.    There are certain equestrian, cattle, sand mining, agricultural, water distribution and other activities currently operating upon portions of the DR Property.

3.    Owner seeks to engage Property Manager for the care, maintenance, protection, and operation of the DR Property and to manage the current level of equestrian, cattle, sand mining, agricultural, water distribution and other operations upon the DR Property, as Owner and Property Manager survey, inventory and assess the actual physical state and operations of the DR Property.

4.    Property Manager desires to be engaged by Owner for the care, maintenance, protection, and operation of the DR Property, and management of the current level of equestrian, cattle, sand mining, agricultural, water distribution and other operations upon the DR Property and to assist Owner in assessing the current physical state of the DR Property for Owner, subject to the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereby agree as follows:

A.    Engagement of Property Manager.  Owner hereby engages Property Manager as the sole and exclusive managing agent to manage and conduct operations on the DR Property. Owner reserves the right to exercise management decisions for the operation of the DR Property in consultation with Property Manager.

EXHIBIT "8"

In the performance of its duties hereunder, Property Manager shall act solely as agent of Owner. Nothing herein shall constitute a partnership or joint venture between Owner and Property Manager. All debts and liabilities to third persons incurred by Property Manager in the course of its operation and management of the DR Property shall be the debts and liabilities of Owner, and Property Manager may so inform third parties with whom it deals on behalf of Owner.

B.    Term. This Agreement is intended to be an interim agreement, for a term of one hundred twenty (120) days, which will become effective on August 1, 2002 and terminate on November 29, 2002. Should the parties decide to continue their relationship beyond such 120-day period, the parties shall promptly enter into good faith negotiations toward the execution of a more comprehensive longer term management agreement, which shall detail the terms and conditions of Property Manager's management role in respect of the DR Property.

C.    Duties and Responsibilities of Property Manager. During the term of this Agreement, Property Manager will focus upon assessing, inventorying, and evaluating the current physical state of the DR Property, and effecting necessary and appropriate repairs and deferred maintenance to the DR Property and/or developing plans for future maintenance and repairs to the physical facilities located on the DR Property, and to conduct and operate the existing equestrian, cattle, sand mining, agricultural, water distribution and other operations on the DR Property. Property Manager's responsibility is limited to conducting ongoing operations of the DR Property, and Property Manager is not to be involved with the future development of the DR Property, except as otherwise provided by separate written agreement.

Property Manager accepts the above stated duties and responsibilities during this Agreement and agrees to perform all services reasonably necessary for the care, protection, maintenance and operation of the DR Property, including but not limited to, the following:

1.    Collect all rental and other income from the equestrian, cattle operations, sand mining operations, agricultural operations, the Mokuleia Water, LLC operations, and other activities on the DR Property as agent and for the benefit of Owner.

2.    Pay all necessary expenses incurred by the operations on the DR Property to include payroll, insurance and taxes.

3.    Employ, discharge and pay all employees necessary to be employed in the management and operation of the DR Property.

The initial employees to be hired under this Agreement, if deemed necessary and appropriate by Property Manager and Owner, are as follows:

    Ranch Manager
    Assistant Ranch Manager
    Agricultural and Equipment Foreman
    Livestock Foreman
    Office Manager
    Housekeeper/Caretaker
    Accounting Clerk/Bookkeeper

Mechanic
Equestrian Trainer
Laborer
Laborer
Laborer
Office Assistant

4.    Purchase on behalf of Owner all livestock, equipment, tools, appliances, materials, feed and supplies necessary for the care, protection, maintenance and/or operation of the DR Property.  Principals of Property Manager will make spending decisions under this section.

5.    Contract for and supervise the making of all repairs and maintenance of operations on the DR Property.  Property Manager, however, shall not contract for any repair, alteration or decoration that costs over $2,500.00 without Owner's prior written approval. Principals of Property Manager will make spending decisions under this section.

6.    Contract for goods and services necessary for the care, protection, operation, and maintenance of the DR Property.  Property Manager, however, shall not make a contract for any such item involving an expenditure of over $2,500.00 without Owner's written approval.  Principals of Property Manager will make spending decisions under this section.

7.    Unless Owner specifies otherwise, Property Manager shall apply for, obtain and maintain in the name of Owner, all licenses, permits and renewals thereof required in connection with management and operation of the DR Property.  Owner shall execute and deliver any and all applications and other documents and otherwise cooperate to the fullest extent with Property Manager in applying for, obtaining and maintaining such licenses, permits and renewals thereof.

8.    Prepare and file all returns and other documents required under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act, or any similar federal or state legislation, and all withholding tax returns required for its employees.  Property Manager shall pay all amounts required to be paid under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act, or any similar federal or state legislation.  Property Manager shall file such returns and reports as may from time to time be required by the US Government and the State of Hawaii.

9.    Maintain full books of account with correct entries of all receipts and expenditures for managing the DR Property, in accordance with such audit and other accounting controls as are agreed upon by Owner and Property Manager.  Such books of account shall be the property of Owner and shall at all reasonable times be open to the inspection of Owner or of any of its officers or duly authorized agents.  Owner shall select the accounting firm to perform accounting services for Property Manager under this Agreement.

10.    Furnish monthly to Owner a detailed statement of all receipts and disbursements for each month, such statement to be furnished on or before the fifteenth (15th) day of each month for the preceding month.  Such statement shall show the status of collections and shall be supported by cancelled checks, vouchers, duplicate invoices, and similar

documentation covering all items of income and expense, which shall be kept in Property Manager's office and be available for inspection by Owner's representatives at all reasonable times. Property Manager shall also furnish a monthly operating statement showing the income and expense for the month and year to date and for the same month of the preceding year.

If at any time during the term of this Agreement, it becomes necessary in Property Manager's reasonable opinion to cease operation of the DR Property in order to protect the DR Property and/or the health, safety and welfare of the guests and/or employees of the DR Property, then in such event Property Manager may close and cease operation of all or part of the DR Property, reopening and commencing operation when Property Manager deems that such may be done without jeopardy to the DR Property, its guests and employees; provided, however, that Owner's prior consent is required for the cessation of any operations on the DR Property under this section for over seventy-two (72) hours.

D.    Deposit Rent and Other Income. All sums received from rents, commissions, sales of water, livestock, agricultural products and services, and other income from the DR Property, shall be deposited from time to time as collected by Property Manager in such bank or banks in the DR Operating Account (as defined below), as Property Manager may designate from time to time. All such receipts shall be collected and held for the benefit of and in trust for Owner, and at all times remain Owner's property. Owner or its designated representative shall have the right to inspect and audit this account and any other accounts used by Property Manager to operate the DR Property at all reasonable times with or without notice.

E.    Budget. Property Manager, from time to time, and at least by the end of the term of this Agreement, shall prepare and submit to Owner a projected annual budget of income and expenses. Property Manager shall also prepare and submit to Owner a projected monthly budget of income and expenses on the fifteenth (15th) day of each month for the following month.

F.    Lease of Equipment and Machinery. Owner hereby grants Property Manager a revocable license to use all personal property acquired by Owner from Malani, Inc. as set forth in Exhibit "A" and Exhibit "B" hereto (the "Personal Property") solely for use in the operation, repair and maintenance of the DR Property. This license shall expire upon termination or expiration of this Agreement. Property Manager shall, at Owner's expense, maintain all Personal Property in its current condition or better, normal wear and tear excepted, subject to the limitations in Paragraph C.5 of this Agreement. Property Manager shall be liable for any repairs or replacement to the extent attributable to unauthorized use or misuse of the Personal Property by Property Manager or its agents, officers, and employees .

G.    Insurance. During the term of this Agreement, Property Manager shall maintain, at Owner's expense, insurance coverage from reputable and financially sound insurance companies, to insure itself and Owner against public liability, professional liability, workers' compensation, fire and extended cover, boiler and machinery, payroll compensation, property, all risk, and such other policies in amounts as necessary and proper for the type of operation and activities conducted on the DR Property or with the Personal Property. Property Manager agrees to include Owner as an additional insured on any such policies, and to provide Owner with complete copies of such policies and certificates of insurance and endorsements which evidence such coverages.

H.   <u>Owner's Funding to Property Manager</u>. Owner will be responsible for funding all operating, repair and maintenance costs relating to the DR Property contemplated by this Agreement by providing to Property Manager initial funds in the amount of $150,000.00 for payment of said operating, repair and maintenance costs (the "Property Management Fund"). Such funds shall be deposited in the bank account of Property Manager (the "DR Operating Account"), from which Property Manager may from time to time withdraw such funds as are necessary for the payment of said operating, repair and maintenance costs, subject to the limitations set forth in Paragraphs C.4, C.5 and C.6 above.

Monthly disbursements from the Property Management Fund shall be shown in the monthly statement furnished by Property Manager to Owner, pursuant to Paragraph C.10 above. Owner agrees to promptly replenish, on a monthly basis, disbursements from the Property Management Fund, in order to maintain the balance of the DR Operating Account at $100,000.00. Owner shall make such replenishment by the first (1st) day of the month following the month in which Property Manager furnishes its monthly statement to Owner.

The parties acknowledge and agree that any funding by Owner pursuant to this section shall be treated as a Category 1 expense in accordance with that certain Development Agreement dated July 31, 2002, by and between Metropolitan Mortgage and Securities Co., Inc. and Mokuleia Preservation Partners, L.L.C., a Hawaii limited liability company.

Owner shall bear all losses resulting from any failure or insolvency of the bank, trust company or other financial institution in which the DR Operating Account is maintained. Upon the termination of this Agreement, and the payment to Property Manager of all amounts due Property Manager upon such termination, all remaining amounts in the DR Operating Account to which Owner is entitled shall be transferred to Owner.

I.   <u>Compensation</u>. As compensation for the services of Property Manager herein, Owner agrees to pay Property Manager a monthly fee equal twelve percent (12%) of the monthly expenditures dedicated to the care, protection, repair, maintenance and operation of the DR Property. All major capital improvement expenses are specifically excluded from consideration in this section. For example, renovation of the office building would be included and construction of the new equestrian clubhouse would be excluded.

J.   <u>Indemnification</u>. Property Manager shall not be liable to Owner or to any other person (a) for any event or occurrence arising prior to the execution of this Agreement; (b) for any act or omission, whether negligent, tortious or otherwise, of any agent or employee of Owner in the performance of this Agreement; or (c) on account of any alleged errors of judgment made in good faith in connection with the performance by Property Manager of the obligations of Property Manager expressed herein. Owner shall not object to any expenditure made by Property Manager in good faith in connection with the performance of Property Manager's obligations hereunder, unless such expenditure is specifically prohibited by this Agreement. Owner shall indemnify, defend and hold harmless Property Manager to the fullest extent permitted by law, from any and all liability, loss, damage, cost or expense (including all attorneys' fees and expenses) arising from or relating to the management, marketing, operation, maintenance or supervision of the DR Property, or any of the foregoing acts or omissions, except any liability, loss, damage, cost or expense arising out of the willful, reckless or wanton misconduct, or gross negligence or bad faith, of Property Manager. Owner's duty to indemnify

Property Manager shall survive the termination of this Agreement, and shall apply to any event or occurrence arising before or after the execution of this Agreement. For purposes of this Section J, Property Manager shall include its principals, employees, officers and agents.

K.    Default; Termination. If any party substantially breaches or substantially fails to perform any of its obligations under this Agreement (the "Defaulting Party"), the other party (the "Non-Defaulting Party") shall have the right to give the Defaulting Party a notice of default (the "Notice of Default"). The Notice of Default shall set forth the nature of the obligations which the Defaulting Party has not performed.

If, within the thirty (30) day period following the Notice of Default, the Defaulting Party in good faith commences to perform such obligation and cure such default and thereafter prosecutes to completion with diligence and continuity the curing thereof and cures such default within a reasonable time, it shall be deemed that the Notice of Default was not given and the Defaulting Party shall lose no rights hereunder. If, within such thirty (30) day period, the Defaulting Party does not commence in good faith the curing of such default or does not thereafter prosecute to completion with diligence and continuity the curing thereof, the Non-Defaulting Party shall have the right to terminate this Agreement upon thirty (30) days' written notice to the Defaulting Party.

L.    Remedies. In addition to the other remedies provided for in this Agreement, each party, in the event of a default by the other party in the performance of its obligations hereunder, shall have available to it all of the remedies at law and in equity that would otherwise be available to it as a result of such breach including, without limitation, the right to recover damages, including reasonable attorneys' fees.

M.    Confidentiality. The parties agree that they will keep the terms of, and all negotiations and matters relating to, this Agreement strictly confidential. Until and unless the prior written consent of the other party is obtained, which consent may be withheld for no or any reason whatsoever, each party shall not disclose or reveal, directly or indirectly, any such information to any third party, under any circumstances, by any means or for any purpose. Each party shall cause such party's employees, officers, directors, attorneys, consultants, servants, agents and other representatives to fully comply at all times with the confidentiality obligations herein contained.

N.    Assignment. Neither party shall have the power to assign or otherwise transfer its interest in this Agreement or any portion thereof without the prior written consent of the other party, which consent may be withheld for no or any reason whatsoever. However, Owner may assign all or a portion of its rights and obligations to an affiliated limited liability company, Paniolo North, LLC.

O.    Non-Waiver. It is expressly understood and agreed that the failure of either party to insist in any one or more instances upon strict performance of any of the terms and conditions of this Agreement, or to exercise any rights of any party, shall not be deemed a waiver or relinquishment of any party's rights to assert or rely upon any such terms, conditions or rights in any other instance.

P.    Dispute Resolution.  Except as otherwise provided in this Agreement or waived in writing by all parties, any disputes arising out of or related to this Agreement, either during the term of the Agreement or afterwards, between the parties hereto, their assignees, their affiliates, their attorneys, or agents, shall be resolved in Honolulu, Hawaii as set forth herein below.

1.    Good Faith Negotiations; Mediation.  The parties shall first seek to negotiate, in good faith and in a timely fashion, a resolution of their dispute.  If such negotiations fail to resolve the dispute, then the parties shall submit the dispute to mediation by Dispute Prevention & Resolution, Inc., a Hawaii corporation ("DPR"). If DPR is unavailable, such mediation shall be handled by the American Arbitration Association ("AAA") under the AAA's Commercial Mediation Rules then in effect.

2.    Arbitration.  If any mediation has failed to resolve the dispute, then the dispute shall be resolved by arbitration by DPR under DPR's arbitration rules.  If DPR is unavailable, such arbitration shall be handled by AAA in accordance with AAA's Rules for Commercial Arbitration then in force, except as otherwise provided herein.  The arbitration shall be conducted in Honolulu, Hawaii, before a single arbitrator, who shall possess the necessary expertise about the subject matter of the dispute to be able to resolve the dispute.  The decision of the arbitrator shall be final and binding, and the arbitration award may be confirmed by a court of competent jurisdiction.  The arbitrator shall not have any power to alter, amend, modify, or change any of the terms of this Agreement or to grant any remedy either prohibited by the terms of this Agreement or not available in a court of law.  The arbitrator may award reasonable attorneys' fees and costs to the prevailing or most prevailing party.  The provisions of applicable Hawaii arbitration law shall govern the arbitration, including the confirmation of any arbitration award.

3.    Payment.  Each party to the arbitration will pay its pro rata share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator.  Arbitration may proceed in the absence of any party, if notice (under the DPR's or AAA's rules and regulations, as applicable) of the proceedings has been given to such party.

4.    Binding Effect and Enforcement.  The parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive, and they may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection.  All such controversies, claims or disputes shall be settled in the above manner, in lieu of any action at law or equity.

5.    Statute of Limitations.  The foregoing provisions of this Section P notwithstanding, a party shall file a demand for arbitration with DPR or, if DPR is unavailable, AAA within ninety (90) days after it has notice (i.e., it knew or should have known) of the event, act or omission that is the basis for the demand.  If a party fails to file that notice of demand within that ninety (90) day period, then the party shall have waived and forfeited any and all rights to challenge that event, act or omission.

6.    Waiver of Jury Trial. Each of the parties to this Agreement irrevocably waives to the fullest extent permitted by law, all rights to trial by jury in any action, proceeding, or counterclaim arising out of or relating to this Agreement.

Q.    Attorney's Fees. If a dispute arises related to the performance of this Agreement by either party and legal or other costs are incurred, it is agreed that the prevailing party shall be entitled to recover all reasonable costs incurred in connection with the dispute, including attorney's fees, and other claim-related expenses.

R.    Notices. All notices with respect to this Agreement shall be deemed received by the parties when delivered in person or by facsimile notice upon confirmation of successful transmission or five (5) days after such notices are deposited in the United States mail, certified, return receipt requested, properly addressed with adequate postage affixed to the following addresses:

If to Owner:

    Metropolitan Mortgage and Securities Co., Inc.
    c/o White and Tom
    820 Mililani Street #711
    Honolulu, HI 96813
    ATTN: Mike Teramoto
    (808) 599-4517

If to Property Manager:

    Dillingham Ranch Management LLC
    1099 Alakea Street, 16th Floor
    Honolulu, Hawaii 96813
    ATTN: A. Bernard Bays
    (808) 528-8805

S.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Hawaii.

T.    Persons Bound. This Agreement shall be binding upon and shall inure to the benefit of the undersigned parties and their successors and permitted assigns.

U.    Severability. If any provisions of this Agreement or the application thereof to any person or circumstances shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby.

V.    Entire Agreement and Amendment. This Agreement constitutes the entire agreement between the parties and supercedes any prior oral or written agreements regarding the subject matter hereof. Any change to this Agreement shall not be effective unless evidenced by a writing signed by the parties hereto.

1468651.7.054286-00001                              8.

W.    <u>Titles and Headings</u>.  Titles and heading to article, sections, and subsections herein are for the purpose of convenience and reference only, and shall in no way limit, define or otherwise affect the provisions hereof.

X.    <u>Neither Party Deemed Drafter</u>.  The parties agree that neither shall be deemed to be the drafter of this Agreement and that in the event this Agreement is ever construed by a court of law, such court shall not construe this Agreement or any provision hereof against either party as the drafter hereof.

Y.    <u>Facsimile Signatures: Counterparts</u>.  This Agreement and all or any related documents may be executed in two or more counterparts, and by a mechanical device or machine or by the use of facsimile signature, and each counterpart, when executed, shall be deemed an original.  All such counterparts, together, shall constitute one agreement or one documents binding on all the parties thereto, notwithstanding that all the parties are not signatory to the original or the same counterpart.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and year first above written.

Owner:

**METROPOLITAN MORTGAGE & SECURITIES CO., INC.,**
a Washington corporation

By: _____
Name:
Its: SECRETARY

**MOKULEIA SHORES, LLC,**
a Hawaii limited liability company

By: _____
Name: REUEL SWANSON
Secretary of Millennium Financial, Inc.
Its: Manager

**KAENA NORTH, LLC,**
a Hawaii limited liability company

By: _____
Name: REUEL SWANSON
Secretary of Millennium Financial, Inc.
Its: Manager

**MOKULEIA ESTATES, LLC,**
a Hawaii limited liability company

By: _____
    Name: REUEL SWANSON
    Secretary of Millennium Financial, Inc.
    Its: Manager

**OCEAN SHORES PROPERTIES, LLC,**
a Hawaii limited liability company

By: _____
    Name: REUEL SWANSON
    Secretary of Millennium Financial, Inc.
    Its: Manager

**COASTAL VIEW PROPERTIES, LLC,**
a Hawaii limited liability company

By: _____
    Name: REUEL SWANSON
    Secretary of Millennium Financial, Inc.
    Its: Manager

**MOKULEIA WATER, LLC,**
a Hawaii limited liability company

By: _____
    Name: REUEL SWANSON
    Secretary of Millennium Financial, Inc.
    Its: Manager

Property Manager:

**DILLINGHAM RANCH MANAGEMENT LLC,**
a Hawaii limited liability company

By Malani, Inc.,
    a Hawaii corporation
    Its Member

By: _____
    Name:  A. Bernard Bays
    Title:    President

By Mokuleia Polo Farms, L.L.C.,
    a Hawaii limited liability company
    Its Member

By: _____
    Name:  Michael K. Daily
    Title:    Member

EXHIBIT "A"

State Well No. 3410-01 and related water system improvements, including but not limited to a water tank, water pump and water pipelines, located on that certain real property located at Mokuleia, Oahu, Hawaii and identified as Tax Map Key Parcel No. (1) 6-8-3-40 and extending outside the property to serve other surrounding properties owned by third parties.

## EXHIBIT "B"

Inventory of Livestock to be included in sale of Mokuleia Property

| No. | Livestock | Description |
|-----|-----------|-------------|
| 1. | Horses | Thoroughbred/Appaloosa Gelding "Shilo", approx. 18 years old<br>"Noni" |
| 2. | Dog | 7 year old Border Collie "Chip" |
| 3. | Cattle | 36 head of cattle:<br><br>Cows:<br>    12 w/bags<br>    7 w/o bags<br><br>Calves:<br>    Bull Calves:  3 over 350 lbs.<br>                  5 less than 350 lbs.<br><br>    Heifer Calves: 3 over 350 lbs.<br>                  3 less than 350 lbs.<br><br>Steer:<br><br>    2 over 500 lbs. |
| 4. | Any and all other items of personality (tangible and intangible) relating to the Property, except as otherwise provided for in that certain Letter Agreement dated July 30, 2002, by and between Seller and Buyer. | |

Inventory of the Big House to be included with sale of Mokuleia Property

| No. | Location | Description |
|-----|----------|-------------|
| 1. | Kitchen | 1 Frigidaire refer<br>1 GE refer<br>1 antique dish cabinet (white)<br>1 antique table (white)<br>1 antique black table – 6'x 6'<br>2 glass antique end tables<br>Wolf 6-burner stove w/oven<br>1 kitchen cabinet w/shelves<br>1 single bed<br>1 Whirlpool dryer<br>1 historic metal cabinet |

|  |  | 14 wood theater chairs<br>8 metal lockers<br>10 white plastic chairs<br>Assorted glasses<br>Assorted dishes<br>Assorted aluminum pots and pans<br>Assorted stainless steel ware |
|---|---|---|
| 2. | Outdoor | Outdoor table w/barrel base – 8'<br>6 wood chairs<br>2 benches<br>1 table<br>3 rattan chairs<br>3 historic white benches – 5' |
| 3. | Guest Rooms | Room 1:<br>2 white rattan chairs<br>2 single green wood beds<br>1 green chest<br>2 wood chairs w/rattan seats<br>1 wood desk<br><br>Room 2:<br>2 single green wood beds<br>1 historic green chest<br>1 wood desk<br>1 wood chair/rattan seat<br><br>Room 3:<br>2 single beds<br>1 wood chest<br>1 dresser<br>1 wood chair w/rattan cushion<br>Interior louver door missing<br><br>Room 4:<br>1 double bed<br>2 rattan white chairs<br>1 glass top round rattan table<br>1 wood gray desk<br><br>Room 5:<br>2 red single beds<br>2 red chairs w/rattan seat<br>1 red wood table<br>1 red wood chest of drawers |

|   |   |   |
|---|---|---|
|   |   | Room 6:<br>2 blue wood single beds<br>2 blue wood chairs w/rattan seat<br>1 wood blue table<br><br>Room 7:<br>2 blue single beds<br>1 blue chair<br>1 blue table<br>1 blue/gray chest<br><br>Room 8:<br>2 blue single beds<br>1 couch<br>1 blue chest<br>1 wood chair w/rattan sheet |
| 4. | Manager's House | Bedroom:<br>2 wooden chests – blue/red<br>2 wood chairs w/rattan seat red<br>1 wood desk red<br>1 JVC TV<br><br>Kitchen:<br>1 historic chopping block table<br>1 stove<br>1 dinette table w/3 chairs<br>1 oak wood chest<br><br>Dining Room:<br>1 dining room table<br>4 chairs<br><br>1 double bed |
| 5. | Any and all other items of personalty (tangible and intangible) relating to the Property, except as otherwise provided for in that certain Letter Agreement dated July 30, 2002, by and between Seller and Buyer. | |

Inventory of Equipment to be Included in sale of Mokuleia Property

| No. | Description |
|---|---|
| 1. | Sharp Calculator |

| 2. | IBM Wheelwriter 30 |
|---|---|
| 3. | Acroprint time Recorder |
| 4. | Hoover Vacuum Cleaner |
| 5. | Sony Cassette Recorder TCM-5000EV |
| 6. | ISE Garbage Disposer |
| 7. | Sears Repair Services for air conditioner |
| 8. | Kenmore Electric Range |
| 9. | Craftsman Lawn Mower |
| 10. | John Deere Lawn Mower, Model MCF 935X130613 (ok) |
| 11. | John Deere Crawler Dozer, Model TD850BH752265 (needs work) |
| 12. | John Deere Bulldozer, Model 450CC271248T (ok) |
| 13. | Kubota Mower/Tractor, Model M4500DT, 10227 (ok but overheats) |
| 14. | John Deere Lawn & Garden Tractor, Model M002854101524 (ok) |
| 15. | Die Hard Battery Charger (broken) |
| 16. | Pocket Colorimeter |
| 17. | Hoist |
| 18. | Container |
| 19. | Scale |
| 20. | ARC Welder (**stolen**) |
| 21. | Metal Leight (broken) |
| 22. | The New Uniclor (disposed) |
| 23. | Sprayer |
| 24. | 4-1/2 Grinder |
| 25. | Bicycle |

| 26. | 1986 Dodge Ram Pick-Up Truck, Model 1B7HW14TXGS08135, 661TJS (ok) |
| 27. | Dodge Ram 4-wheel drive pick-up, Model JB7FM45L95PO54562 (needs new transmission) |
| 28. | 1986 Jeep Comanche, Model JTWU86T5HT121581 (needs head gasket) |
| 29. | 1992 Chevrolet Pick-Up Truck, Model 1GCDC14K1NZ14791, 963TPC (ok) |
| 30. | 1980 Chevrolet Van, Model CGD15A7100832, 945TPE (ok) |
| 31. | 1987 Nissan light Pick-Up Truck, No. JN6ND065 (needs work) |
| 32. | GMC Dump Truck, Model GDM7DYLV501720 (GVW 32060) |
| 33. | Ford MPVH Truck |
| 34. | Weedeater |
| 35. | Weedeater |
| 36. | Paint/Accessories |
| 37. | NAPA Battery Charger, Model 853000 (ok) |
| 38. | Craftsman 30-gal Air Compressor (ok) |
| 39. | Iseki-1700 Rotary tiller |
| 40. | Maruyama Mist Duster |
| 41. | Maruyama Mist Duster (for fertilizer) |
| 42. | Pump |
| 43. | 4-gallon Backpack sprayer |
| 44. | 5-water Winch Sprinklers |
| 45. | Power Painter |
| 46. | John Deere Push Mower, No. 217 |
| 47. | Ford Tractor, C607732, Model C317J133769M |
| 48. | Hydraulic Floor jack |

| 49. | SuperVault Trusco Diesel & Gas Tank |
|-----|-------------------------------------|
| 50. | Grease Gun |
| 51. | Angle Grinder |
| 52. | Makita Drill |
| 53. | Craftsman Chainsaw |
| 54. | Echo Hedge Trimmer |
| 55. | Titan Weed Eater (MCQ 2560 AV 400064-03, Serial No. 12-014625) |
| 56. | Titan Weed Eater (MCQ 3000 AV 24680000U, Serial No. 01-001690) |
| 57. | Titan Weed Eater (MCQ 3000 AV 24680000U, Serial No. 01-002104) |
| 58. | Titan Weed Eater (MCQ 2560 AV 400064-03, Serial No. 12-014630) |
| 59. | Shindaiwa Grass Trimmer (**stolen**) see police report |
| 60. | Sears Air Compresser (**stolen**) see police report |
| 61. | Napa Tool Chest (**stolen**) see police report |
| 62. | Battery Charger (**stolen**) see police report |
| 63. | John Deere Back Hoe Loader, Model TO510CB752542 (ok) |
| 64. | Toro Chipper, Model D933018620, 1820 (needs work) |
| 65. | Tiller, Model SAR1700 (ok) |
| 66. | Lincoln Electric Ranger Welder/Generator (ok) |

| 67. | Skill Saw, Model 5150 (old) |
|-----|-----------------------------|
| 68. | Craftsman 16-in Chain Saw (ok) |
| 69. | Flail Mower (needs PTO shaft and misc. work) |
| 70. | 2 Waterpumps (ok) |
| 71. | Any and all other items of personalty (tangible and intangible) relating to the |

Property, except as otherwise provided for in that certain Letter Agreement dated July 30, 2002, by and between Seller and Buyer.

## CONSULTANT AGREEMENT

THIS AGREEMENT made this 31st day of July, 2002, between
**METROPOLITAN MORTGAGE AND SECURITIES CO., INC.**, a Washington corporation
(the "Company"), whose business address is 601 W. 1st Avenue, Dept. 160000, Spokane,
Washington 99201-5060, and **MALANI, INC.**, a Hawaii corporation (hereinafter "Consultant"),
whose mailing address is 1099 Alakea Street, 16th Floor, Honolulu, Hawaii 96813.

## W I T N E S S E T H :

WHEREAS, pursuant to that certain letter agreement ("Letter Agreement"), dated
June 27, 2002, between Summit Property Development ("Summit") and Malani, Inc., Summit or
its designee agreed to purchase from Malani, Inc., certain property located at Mokuleia, Oahu,
Hawaii, the "DR Property," which in turn consists of the "Beachfront Parcels" and the "Mauka
Land" (the DR Property, Beachfront Parcels and Mauka Land are further described and
identified in the letter agreement and, unless otherwise specified herein, all capitalized terms
shall have the same meanings assigned to them in the Letter Agreement); and

WHEREAS, Summit Property Development has designated the Company as
designee under the Letter Agreement to develop the Mauka Land in accordance with the Summit
Project Concept set forth in the Business Plan and Project Maps previously provided to Summit
("Project"); and

WHEREAS, the Company will establish and periodically review and revise
strategies, policies, designs and goals for the Project in consultation with Consultant; and

WHEREAS, the Company desires to utilize the expertise of Consultant with
respect to the operation, development and sale of the Project; and

WHEREAS, Consultant is an independent contractor and is currently registered
with the State of Hawaii under General Excise Tax License Number 10423422; and

WHEREAS, Consultant agrees to provide consulting services to the Company as
an independent contractor under the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual promises and covenants
herein, the parties agree as follows:

1.    DURATION

The term of this Agreement shall be from August 1, 2002, to August 1, 2006,
unless sooner terminated by either party pursuant to Section 8 below.

2.    SERVICES TO BE PROVIDED BY CONSULTANT

a.    The services to be performed by Consultant for the Company
include assisting with the planning, development and sale of the Project. Throughout the term of
this Agreement, Consultant will meet with the Company through its designated representatives to

**EXHIBIT "5"**

provide information, advice, assistance and recommendations to the Company regarding all aspects of the development of the Project to include, but not be limited to, the planning, design, budgeting, management, operation, marketing and sales of the Project as market conditions evolve.

        b.      The Company may, during the term of this Agreement, engage other independent contractors to perform similar work that Consultant performs hereunder.

        c.      Consultant may perform services for any other entity or person, or otherwise conduct business, during the term of this Agreement so long as such work: (1) does not conflict with Consultant's obligations hereunder; or (2) is not performed for an entity or person that is in direct competition with the Company or its affiliates or partners.

        d.      Consultant will spend the amount of time reasonably required to perform the services provided for herein; but the Company acknowledges Consultant will not be spending full-time as to such services, and will be engaged in other business endeavors.

3.      PAYMENT FOR SERVICES

        a.      <u>Quarterly Fee</u>. The Company will pay Consultant a quarterly fee of Twenty-Five Thousand and No/100 Dollars ($25,000.00) in advance for the services to be provided under this Agreement.

        b.      <u>Date of Payment</u>. Payment by the Company shall be made to Consultant quarterly in advance, commencing on August 1, 2002, and each quarter thereafter (i.e., on the first day of November, February, May and August). All service fees are subject to Hawaii's general excise tax and shall be paid by the Company.

4.      RELATIONSHIP OF PARTIES

        a.      It is expressly agreed by the parties hereto that Consultant is not hereunder an agent or employee of the Company for any purpose whatsoever, but is an independent contractor. Furthermore, no relationship of joint venture or partnership of any form is created by this Agreement.

        b.      The Company neither reserves, nor will it exercise, any control or direction over the method or manner by which Consultant provides his services, including whether and on what terms Consultant hires his employees, agents, or subordinates, nor will the Company exercise any control over Consultant as to how Consultant provides his services so as to best achieve the objectives of this Agreement.

        c.      Consultant agrees that he will not hold out to the general public, customers, clients or others that Consultant is an agent, officer, or employee of the Company. Consultant further agrees and understands that he has no authority to bind or obligate the Company, with respect to third parties, in any way whatsoever. In the event Consultant does bind or obligate the Company, with respect to third parties, in some way, Consultant shall be solely liable for performance and payment of such commitments and for any costs and damages to the Company in connection therewith.



      d.      It is expressly agreed by the parties hereto that the Company is not obligated or bound to accept or implement the advice, conclusions or recommendations suggested by Consultant and that the Company has sole authority to establish strategies, policies, objectives and goals for the development, management and operation of the Project.

5.      RESPONSIBILITY FOR EMPLOYEES AND AGENTS

      a.      No agent, employee or servant of consultant, if any, shall be or shall be deemed to be the employee, agent or servant of the Company. None of the benefits provided by the Company to its employees including, but not limited to, medical benefits, disability compensation insurance and unemployment insurance, are available from the Company to the employees, agents or servants of Consultant.

      b.      Consultant represents and warrants that he provides all benefits and insurance to his employees as required by state and federal laws. Consultant agrees that all state and federal taxes, fees, assessment or contributions, or insurance payments covering Consultant and his employees, if any, shall be the sole responsibility of Consultant including, but not limited to, state and federal withholding taxes, social security taxes, workers' compensation insurance, general excise taxes and self-employment taxes.

6.      LAWSUITS; INDEMNIFICATION

      a.      <u>Lawsuits</u>. If a lawsuit, administrative complaint or other similar action is filed by a third party against Consultant and/or the Company arising from any services provided hereunder, both parties agree to cooperate with one another in the investigation and defense of the suit, administrative complaint or other action.

      b.      <u>Indemnification by Consultant</u>. Consultant shall protect, defend, indemnify, and save harmless the Company, its agents and employees against and from all claims, damages, losses and expenses, including but not limited to attorneys' fees and costs, by reason of any suit, claim, demand, judgment or cause of action initiated by any person, arising or alleged to have arisen out of Consultant's gross negligence, intentional misfeasance, willful misconduct or violation of any law or breach of this Agreement.

      c.      <u>Indemnification by the Company</u>. The Company shall protect, defend, indemnify and save harmless Consultant, its agents and employees against and from all claims, damages, losses and expenses, including but not limited to attorneys' fees and costs, by reason of any suit, claim, demand, judgment or cause of action initiated by any person, arising or alleged to have arisen out of the Company's negligence, gross negligence, intentional misfeasance, willful misconduct or violation of any law, or breach of this Agreement, or the development and/or sale of the Project, or action taken by the Consultant within the scope of Consultant's work on the Project which has not arisen out of Consultant's gross negligence, intentional misfeasance, willful misconduct or violation of any law or breach of this Agreement.

7.      CONFIDENTIALITY OF INFORMATION

      a.      All information of any nature that is made available by the Company or that becomes available to Consultant by virtue of this Agreement or the relationship created by this Agreement, other than public information, shall be held in strict confidence by



Consultant. Such confidential disclosures made available by the Company to Consultant are made in reliance on this promise.

b.    All parties hereto acknowledge and recognize that Consultant has and will have access to and shall acquire knowledge of confidential information and that in the event of the breach of the terms and conditions of this Agreement, then the Company shall be entitled to, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages for any breach of this Agreement, and/or to enjoin Consultant from disclosing such information, but nothing herein contained shall be construed or interpreted to prevent such remedy in the courts, in the case of any breach of this Agreement by Consultant, as the Company may elect to invoke.

8.    TERMINATION OF AGREEMENT

a.    In the event that either party fails to substantially perform any of the covenants under this Agreement, the non-breaching party may, at its option, terminate this Agreement on thirty (30) days' written notice.

b.    In the event of Project sellout before the end of the term of this Agreement, this Agreement shall terminate and the fee set forth in paragraph 3 above shall be prorated to the date of the close of the last sale and escrow for the Project.

9.    ARBITRATION OF DISPUTES

Any dispute by or between Company and Consultant arising out of or incident to this Agreement or the breach thereof, shall be submitted to mediation first and, if necessary, to arbitration with Dispute Prevention & Resolution, Inc. ("DPRI"), or such other dispute resolution agency as the parties may mutually select. Any party that desires to submit any issue or dispute to arbitration shall promptly so notify the other party in writing. The dispute shall be heard by a single arbitrator. The arbitration shall be conducted in accordance with the commercial arbitration rules of DPRI then in effect. The decision of the arbitrator shall be final, conclusive and binding on the parties hereto. All proper costs and expenses of such arbitration including, without limitation, witness fees, attorney's fees and the fees of the arbitrator shall be charged to the party or parties in such amounts as the arbitrator shall determine at the time of the award. An award so rendered shall be binding in all aspects and shall be subject to the provisions of Chapter 658, Hawaii Revised Statutes, as the same may be amended from time to time. Company and Consultant agree that any arbitration proceedings under this section will be submitted to arbitration in Honolulu, Hawaii.

10.    MISCELLANEOUS

a.    Entire Agreement. This Agreement embodies the entire agreement of the parties and supersedes any other agreements or understandings, oral or written, with respect thereto that may ever have existed between the parties hereto.

b.    Amendment. This Agreement may be amended only by an instrument in writing signed by both parties.

c.  Waiver. The failure of any party to enforce, at any time, any provision of this Agreement shall not constitute a waiver of the right thereafter to enforce the same or any other provision of this Agreement.

d.  Assignment. This Agreement may not be assigned, in whole or part, by either party without the other party's prior written consent.

e.  Severability. If any provision of this Agreement or the application thereof to any person or circumstance is invalid or unenforceable to any extent, the remainder of this Agreement and the application thereof to other persons or circumstances shall not be affected thereby.

f.  Applicable Law. This Agreement shall be governed by the laws of the State of Hawaii both as to interpretation and performance.

g.  Notices. All notices, requests, demands, consents and other communications which are required to be given in writing shall be given by registered or certified mail, return receipt requested, postage prepaid, addressed to Company President/General Manager or Consultant, as the case may be, at the address set forth above or at such other post office address as either may from time to time designate by writing or by personally delivering such notice to the other party. Any such notice, request, demand, consent or other communication shall be deemed to have been given on the date of such mailing or personal delivery.

IN WITNESS WHEREOF, the parties have signed this Agreement on the day and year first above written.

METROPOLITAN MORTGAGE AND
SECURITIES CO., INC.

By _____
Its:

MALANI, INC.

By _____
Its:  President

## CONSULTANT AGREEMENT

THIS AGREEMENT made this 31st day of July, 2002, between **METROPOLITAN MORTGAGE AND SECURITIES CO., INC.**, a Washington corporation (the "Company"), whose business address is 601 W. 1st Avenue, Dept. 160000, Spokane, Washington 99201-5060, and **MOKULEIA POLO FARMS, L.L.C.**, a Hawaii limited liability company (hereinafter "Consultant"), whose mailing address is 1696 Ala Moana Boulevard, Honolulu, Hawaii 96815.

## W I T N E S S E T H :

WHEREAS, pursuant to that certain letter agreement ("Letter Agreement"), dated June 27, 2002, between Summit Property Development ("Summit") and Malani, Inc., Summit or its designee agreed to purchase from Malani, Inc., certain property located at Mokuleia, Oahu, Hawaii, the "DR Property," which in turn consists of the "Beachfront Parcels" and the "Mauka Land" (the DR Property, Beachfront Parcels and Mauka Land are further described and identified in the letter agreement and, unless otherwise specified herein, all capitalized terms shall have the same meanings assigned to them in the Letter Agreement); and

WHEREAS, Summit Property Development has designated the Company as designee under the Letter Agreement to develop the Mauka Land in accordance with the Summit Project Concept set forth in the Business Plan and Project Maps previously provided to Summit ("Project"); and

WHEREAS, the Company will establish and periodically review and revise strategies, policies, designs and goals for the Project in consultation with Consultant; and

WHEREAS, the Company desires to utilize the expertise of Consultant with respect to the development and sale of the Project; and

WHEREAS, Consultant is an independent contractor and is currently registered with the State of Hawaii under General Excise Tax License Number _____; and

WHEREAS, Consultant agrees to provide consulting services to the Company as an independent contractor under the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein, the parties agree as follows:

1.    DURATION

The term of this Agreement shall be from August 1, 2002, to August 1, 2006, unless sooner terminated by either party pursuant to Section 8 below.

2.    SERVICES TO BE PROVIDED BY CONSULTANT

a.    The services to be performed by Consultant for the Company include assisting with the planning, development and sale of the Project. Throughout the term of

EXHIBIT "7"

this Agreement, Consultant will meet with the Company through its designated representatives to provide information, advice, assistance and recommendations to the Company regarding all aspects of the development of the Project to include, but not be limited to, the planning, design, budgeting, management, operation, marketing and sales of the Project as market conditions evolve.

       b.     The Company may, during the term of this Agreement, engage other independent contractors to perform similar work that Consultant performs hereunder.

       c.     Consultant may perform services for any other entity or person, or otherwise conduct business, during the term of this Agreement so long as such work: (1) does not conflict with Consultant's obligations hereunder; or (2) is not performed for an entity or person that is in direct competition with the Company or its affiliates or partners.

       d.     Consultant will spend the amount of time reasonably required to perform the services provided for herein; but the Company acknowledges Consultant will not be spending full-time as to such services, and will be engaged in other business endeavors.

      3.     PAYMENT FOR SERVICES

       a.     <u>Quarterly Fee</u>. The Company will pay Consultant a quarterly fee of Twenty-Five Thousand and No/100 Dollars ($25,000.00) in advance for the services to be provided under this Agreement.

       b.     <u>Date of Payment</u>. Payment by the Company shall be made to Consultant quarterly in advance, commencing on August 1, 2002, and each quarter thereafter (i.e., on the first day of November, February, May and August). All service fees are subject to Hawaii's general excise tax and shall be paid by the Company.

      4.     RELATIONSHIP OF PARTIES

       a.     It is expressly agreed by the parties hereto that Consultant is not hereunder an agent or employee of the Company for any purpose whatsoever, but is an independent contractor. Furthermore, no relationship of joint venture or partnership of any form is created by this Agreement.

       b.     The Company neither reserves, nor will it exercise, any control or direction over the method or manner by which Consultant provides his services, including whether and on what terms Consultant hires his employees, agents, or subordinates, nor will the Company exercise any control over Consultant as to how Consultant provides his services so as to best achieve the objectives of this Agreement.

       c.     Consultant agrees that he will not hold out to the general public, customers, clients or others that Consultant is an agent, officer, or employee of the Company. Consultant further agrees and understands that he has no authority to bind or obligate the Company, with respect to third parties, in any way whatsoever. In the event Consultant does bind or obligate the Company, with respect to third parties, in some way, Consultant shall be solely liable for performance and payment of such commitments and for any costs and damages to the Company in connection therewith.

d.     It is expressly agreed by the parties hereto that the Company is not obligated or bound to accept or implement the advice, conclusions or recommendations suggested by Consultant and that the Company has sole authority to establish strategies, policies, objectives and goals for the development, management and operation of the Project.

5.     RESPONSIBILITY FOR EMPLOYEES AND AGENTS

a.     No agent, employee or servant of consultant, if any, shall be or shall be deemed to be the employee, agent or servant of the Company.  None of the benefits provided by the Company to its employees including, but not limited to, medical benefits, disability compensation insurance and unemployment insurance, are available from the Company to the employees, agents or servants of Consultant.

b.     Consultant represents and warrants that he provides all benefits and insurance to his employees as required by state and federal laws.  Consultant agrees that all state and federal taxes, fees, assessment or contributions, or insurance payments covering Consultant and his employees, if any, shall be the sole responsibility of Consultant including, but not limited to, state and federal withholding taxes, social security taxes, workers' compensation insurance, general excise taxes and self-employment taxes.

6.     LAWSUITS; INDEMNIFICATION

a.     <u>Lawsuits</u>.  If a lawsuit, administrative complaint or other similar action is filed by a third party against Consultant and/or the Company arising from any services provided hereunder, both parties agree to cooperate with one another in the investigation and defense of the suit, administrative complaint or other action.

b.     <u>Indemnification by Consultant</u>.  Consultant shall protect, defend, indemnify, and save harmless the Company, its agents and employees against and from all claims, damages, losses and expenses, including but not limited to attorneys' fees and costs, by reason of any suit, claim, demand, judgment or cause of action initiated by any person, arising or alleged to have arisen out of Consultant's gross negligence, intentional misfeasance, willful misconduct or violation of any law or breach of this Agreement.

c.     <u>Indemnification by the Company</u>.  The Company shall protect, defend, indemnify and save harmless Consultant, its agents and employees against and from all claims, damages, losses and expenses, including but not limited to attorneys' fees and costs, by reason of any suit, claim, demand, judgment or cause of action initiated by any person, arising or alleged to have arisen out of the Company's negligence, gross negligence, intentional misfeasance, willful misconduct or violation of any law, or breach of this Agreement, or the development and/or sale of the Project, or action taken by the Consultant within the scope of Consultant's work on the Project which has not arisen out of Consultant's gross negligence, intentional misfeasance, willful misconduct or violation of any law or breach of this Agreement.

7.     CONFIDENTIALITY OF INFORMATION

a.     All information of any nature that is made available by the Company or that becomes available to Consultant by virtue of this Agreement or the relationship created by this Agreement, other than public information, shall be held in strict confidence by

1468645.2.054286-00001                          3.

Consultant. Such confidential disclosures made available by the Company to Consultant are made in reliance on this promise.

       b.    All parties hereto acknowledge and recognize that Consultant has and will have access to and shall acquire knowledge of confidential information and that in the event of the breach of the terms and conditions of this Agreement, then the Company shall be entitled to, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages for any breach of this Agreement, and/or to enjoin Consultant from disclosing such information, but nothing herein contained shall be construed or interpreted to prevent such remedy in the courts, in the case of any breach of this Agreement by Consultant, as the Company may elect to invoke.

       8.    TERMINATION OF AGREEMENT

       a.    In the event that either party fails to substantially perform any of the covenants under this Agreement, the non-breaching party may, at its option, terminate this Agreement on thirty (30) days' written notice.

       b.    In the event of Project sellout before the end of the term of this Agreement, this Agreement shall terminate and the fee set forth in paragraph 3 above shall be prorated to the date of the close of the last sale and escrow for the Project.

       9.    ARBITRATION OF DISPUTES

       Any dispute by or between Company and Consultant arising out of or incident to this Agreement or the breach thereof, shall be submitted to mediation first and, if necessary, to arbitration with Dispute Prevention & Resolution, Inc. ("DPRI"), or such other dispute resolution agency as the parties may mutually select. Any party that desires to submit any issue or dispute to arbitration shall promptly so notify the other party in writing. The dispute shall be heard by a single arbitrator. The arbitration shall be conducted in accordance with the commercial arbitration rules of DPRI then in effect. The decision of the arbitrator shall be final, conclusive and binding on the parties hereto. All proper costs and expenses of such arbitration including, without limitation, witness fees, attorney's fees and the fees of the arbitrator shall be charged to the party or parties in such amounts as the arbitrator shall determine at the time of the award. An award so rendered shall be binding in all aspects and shall be subject to the provisions of Chapter 658, Hawaii Revised Statutes, as the same may be amended from time to time. Company and Consultant agree that any arbitration proceedings under this section will be submitted to arbitration in Honolulu, Hawaii.

       10.    MISCELLANEOUS

       a.    Entire Agreement. This Agreement embodies the entire agreement of the parties and supersedes any other agreements or understandings, oral or written, with respect thereto that may ever have existed between the parties hereto.

       b.    Amendment. This Agreement may be amended only by an instrument in writing signed by both parties.

c.    Waiver.  The failure of any party to enforce, at any time, any provision of this Agreement shall not constitute a waiver of the right thereafter to enforce the same or any other provision of this Agreement.

d.    Assignment.  This Agreement may not be assigned, in whole or part, by either party without the other party's prior written consent.

e.    Severability.  If any provision of this Agreement or the application thereof to any person or circumstance is invalid or unenforceable to any extent, the remainder of this Agreement and the application thereof to other persons or circumstances shall not be affected thereby.

f.    Applicable Law.  This Agreement shall be governed by the laws of the State of Hawaii both as to interpretation and performance.

g.    Notices.  All notices, requests, demands, consents and other communications which are required to be given in writing shall be given by registered or certified mail, return receipt requested, postage prepaid, addressed to Company President/General Manager or Consultant, as the case may be, at the address set forth above or at such other post office address as either may from time to time designate by writing or by personally delivering such notice to the other party.  Any such notice, request, demand, consent or other communication shall be deemed to have been given on the date of such mailing or personal delivery.

IN WITNESS WHEREOF, the parties have signed this Agreement on the day and year first above written.

METROPOLITAN MORTGAGE AND
SECURITIES CO., INC.

By _____
Its: SECRETARY

MOKULEIA POLO FARMS, L.L.C.

By _____
Its: Member